had been unconditional, being a mere quitclaim without covenant from a mere occupant having no title, it would not bar the releasor from asserting the after acquired title from the United States. Lownsdale v. Portland [Case No. 8,578]. The rule of law upon this question is established beyond doubt. The authorities go in one unbroken current to the effect stated. But not only has the defendant failed to prove a dedication to public use, but upon the whole evidence, it satisfactorily appears, that there never was any such dedication or intention to make it, apart from the proceedings connected with the giving of the release. The map drawn by John Brady from the survey of Short, is in evidence. The latter recognizes it and testifies that it was made from his survey. The map is without date, but it is proven that the Short survey was made in the spring of 1850, and Short also testifies that he saw the Brady map in Portland in the fall of that year. From the inspection of that map it plainly appears that Front street is bounded by two parallel lines, and that the strip of land between the east line of said street and the Wallamet river is laid off in blocks and lots varying in depth with the meanderings of the river. Nothing appearing to the contrary, this fact alone is sufficient to decide the question against the defendant. Nor is this all; the defendant, on April 29, 1852, by a resolution of its common council, deliberately recognized and adopted this map as a correct representation of the plat of the streets and blocks and lots delineated thereon. In the year 1854 the corporate authorities assessed the premises in controversy as private property and collected the tax in 1855. The same thing was done in 1858. D. H. L. always claimed this so-called levee as private property and constantly asserted his right to it, by notice to the public, by sales of portions of it. by actual occupation from time to time, and by payment of taxes levied thereon by defendant. Even since the commencement of this suit the defendant has, by two different ordinances passed by its common council, deliberately admitted that the levee was. private property. Ordinances of June 14 and August 6, 1861. The complainant is shown to be the legal owner of the premises, and it does not appear that they were ever dedicated to public use by the grantor of the complainant, or any one else. The defendant did, and was threatening and proceeding to continue to commit the trespasses complained under a claim of right or use in the premises.

Decree, that the town of Portland, and the corporate authorities thereof, of whatever name or nature, be perpetually enjoined from asserting any right, title, or interest in said premises, or in any way trespassing upon or molesting the complainant in the occupation and use thereof by reason of the supposed dedication in its answer alleged and set up, and for costs.

LOWREY (WHARTON v.). See Case No. 17,481.

LOWRY (BLYDENBURGH v.). See Case No. 1,582.

## Case No. 8,580.
### LOWRY v. CANAL BOAT.
[See Case No. 8,582.]

## Case No. 8,581.
LOWRY v. COMMERCIAL & FARMERS' BANK et al.

[Taney, 310:[1] 3 Am. Law J. (N. S.) 111; Brunner, Col. Cas. 331; 6 West. Law J. 121.]

Circuit Court, D. Maryland. April Term, 1848.

EXECUTOR—BEQUEST OF BANK-STOCK—PLEDGE FOR INDIVIDUAL DEBT—NOTICE—TRANSFER OF STOCK—LIABILITY OF BANK FOR IMPROPER TRANSFER—LIABILITY FOR TESTATOR'S DEBTS.

1. Bank-stock was bequeathed to the testator's executors, and the survivor of them, to pay the dividends to one for life, with remainder over; and the executors were, by a decree in chancery. directed to hold the same in trust to pay the dividends to the devisee for life, and after her death, to divide the stock between those in remainder. The testator died rich; and several years after his death, and after all his debts were paid, one of the executors pledged the stock, which was still standing in the testator's name, to another bank to secure his individual debt; the debt being afterwards paid. the stock was transferred to T. J. & Co., one of the executors being the sole member of that firm, and was by him re-transferred into the names of himself and his co-executor, as executors. Afterwards he, signing his name as acting executor, again pledged the stock to the said bank, to secure other debts of the firm of T. J. & Co.; and a note. for which said stock was held in pledge, not being paid, in consequence of the failure and entire insolvency of the firm of T. J. & Co.. the stock was sold, and the proceeds applied to its payment. leaving a balance in the hands of the bank. The last dividend on the stock, before it was sold, was received and retained by the bank; but the other dividends, which accrued whilst the stock was in pledge, were received by the said executor; those first received were paid over by him to the legatee for life. but the others were not. On a bill filed by the legatee for life. who was an alien residing in Ireland. to recover the dividends due to her. *held*: That as the bank, to whom the stock was pledged, paid a valuable consideration for it, and had no notice. actual or constructive, of any violation of trust. upon which the transfer could be impeached in equity, it had a right to sell the stock for the payment of the note for which it was pledged, and to make the purchasers a valid title.

2. Purchasers of stock are not bound to look beyond the certificate, or to examine the books of the corporation, to ascertain the validity of the transfer.

[Cited in Pratt v. Taunton Copper Co., 123 Mass. 112.]

3. But the corporation whose stock is transferred, is made the custodian of the shares, and is clothed with power to protect the rights of every one from unauthorized transfers. It is a trust placed in its hands for the protection of individual interests. and like every other trustee, it is bound to execute the trust with proper dili-

---

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]